VICTOR CONSTRUCTION, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent JOHN VISHNEVSKY and MARGARET ANN VISHNEVSKY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Victor Constr., Inc. v. Commissioner
Docket Nos. 7621-72, 7622-72.
United States Tax Court
T.C. Memo 1974-256; 1974 Tax Ct. Memo LEXIS 72; 33 T.C.M. (CCH) 1136; T.C.M. (RIA) 74256; September 23, 1974, Filed. *72 Petitioner John Vishnevsky received certain properties from a corporation in which he held a stockholder interest. The respondent determined that the fair market value of the property received exceeded the consideration provided by petitioner with the result that petitioner received a dividend.Held, fair market value of the properties determined.$12
Sherwin C. Peltin, for the petitioners. Kenneth W. McWade, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent has determined the following deficiencies in petitioners' income tax: Year
Amount Victor Construction, Inc., Docket No. 7621-72
Ended 5/31/70
$11,655.09
John Vishnevsky and Margaret Ann Vishnevsky, Docket No. 7622-72
1966
1,491.35
1967
1,820.51
1969
3,651.29
1970
3,177.69
The only issue remaining for decision is the valuation of certain real properties, both improved and unimproved. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Victor Construction, Inc., formerly National Development and Investment Corporation (hereinafter referred to as Victor), is a corporation formed under the laws *73 of the State of Wisconsin, which had its principal place of business in West Allis, Wisconsin, at the time its petition was filed in this case.Victor filed its Federal income tax return for the taxable year ending May 31, 1970, with the district director of internal revenue, Milwaukee, Wisconsin. The stock of Victor was held in equal amounts by John Vishnevsky and Byron Speich.
John Vishnevsky and Margaret Ann Vishnevsky are husband and wife, who maintained their legal residence in Brookfield, Wisconsin, at the time their petition was filed in this case. They filed their joint Federal income tax returns for 1966, 1967, 1968, 1969 and 1970 with the district director of internal revenue, Milwaukee, Wisconsin. Northeast Shores, Inc. (hereinafter referred to as Northeast), is a corporation formed under the laws of the State of Wisconsin in 1967 for the purpose of acquiring unimproved real estate for development, including the construction of residential and apartment properties in the Oshkosh, Wisconsin, area. At the time of formation, the shareholders of Northeast, each of whom owned 250 shares, were William Rasmussen, Sr., William Rasmussen, Jr., Byron Speich and John Vishnevsky. *74 In 1967 Northeast purchased property adjoining Lake Winnebago, known as Rasmussen Subdivision. Northeast purchased this property from William Rasmussen, Sr., a mortgage for the entire amount being executed in connection with the purchase. Under the original agreement William Rasmussen, Sr., was to be paid 12-1/2 cents per square foot on his mortgage for property of Rasmussen Subdivision which Northeast sold. Northeast made improvements to the Rasmussen Subdivision prior to April 30, 1969, which improvements included obtaining a change in zoning, the construction of streets, installation of lights, water lines, subdividing and platting, canal construction, dredging for a boat harbor, and the construction of multiple family dwellings on certain portions of the property. In 1968, Northeast purchased land in the Westhaven Subdivision in Oshkosh, Wisconsin and began construction of single family homes thereon. The corporate minutes of Northeast for November 6, 1968, indicate that the following properties, among others, were available for immediate sale at the following prices: four complete duplexes at $42,000 each; eight duplexes under construction at $42,000 each; and two *75 Westhaven properties (single family residences) at $26,500 each. On March 21, 1969, Northeast and its stockholders, individually, entered into an agreement which provided for the sale of certain properties owned by Northeast to the four stockholders. Under the March 21 agreement, the four individuals, in consideration for certain of the transfers of property to them, agreed to assume the obligations of Northeast to William F. Rasmussen. The agreement provided that the following properties in Rasmussen Subdivision would be sold to Speich and Vishnevsky: Lot 21, Lot 5, Lot 6, Lot 7, Lot 8, Lot 9, Lot 10, odd piece adjacent to Lot 5, southerly 343.50 feet of Outlot 1 and northerly 340.50 feet of Outlot 2. Northeast also agreed to transfer six duplexes on lands north of Greenwood Court to Speich and Vishnevsky. The selling price of each duplex was $31,000. The agreement further provided that Speich and Vishnevsky would pay $3,333.33 on the note to Rasmussen with respect to each duplex they acquired. The agreement was later modified to provide that only two duplex units rather than six would be sold to Speich and Vishnevsky, the remaining four units to be sold to another individual. *76 Finally, the March 21 agreement provided that one of the two single family residences in the Westhaven Subdivision properties would be conveyed to Speich and Vishnevsky. On April 30, 1969, Northeast transferred to Speich and Vishnevsky, or their designees, the unimproved lands described in the March 21 agreement and two completed duplexes. Title to the unimproved properties was taken in the name of Victor or Capital Highlands Development Corporation (hereinafter referred to as Capital Highlands), which was also owned equally by Speich and Vishnevsky. Victor received title to Lot 21 and southerly 343.50 feet of Outlot 1, whereas Capital Highlands received title to the remaining unimproved properties. Also on April 30, 1969, Northeast transferred directly to Vishnevsky the duplex at 824-26 Greenwood Court and the single family house on Westhaven Boulevard. On its books, Northeast reported the transfer as a sale for $19,500. For the year 1969, the City of Oshkosh assessed the designated parcels of land, as follows: (a)
lot 21
$3,700
(b)
lot 5
2,000
(c)
lot 6
1,500
(d)
lot 7
1,500
(e)
lot 8
1,000
(f)
lot 9
1,000
(g)
lot 10
1,000
(h)
odd piece adjacent to lot 5 *
(i)
southerly 343.50 feet of outlot 1
7,000
(j)
northerly 340.50 feet of outlot 2
5,300
*77 As of May 1, 1969, the City of Oshkosh assessed a duplex similar to those in issue on Greenwood Court at $12,600. On July 31, 1969, Capital Highlands transferred the following property received from Northeast under the March 21, 1969 agreement, as modified, to National Development and Investment, Inc.: Lot 5, Lot 6, Lot 7, Lot 8, Lot 9, Lot 10, odd piece adjacent to Lot 5, northerly 340.50 feet of Outlot 2. National Development and Investment, Inc. (hereinafter referred to as N.D.I.I.), was formed by John Vishnevsky and Byron Speich, each owning 50 percent of the shares outstanding for purposes of real estate development. On August 1, 1969, Byron Speich sold his 1/2 interest in N.D.I.I. to Adolph C. Zinn for $34,000. The only significant asset of a tangible nature held by N.D.I.I. was the property transferred by Capital Highlands. John Vishnevsky prepared computations for use in connection with the sale of Speich's interest in N.D.I.I. At Zinn's request, he allocated the purchase price among the properties owned by N.D.I.I. This computation resulted in an allocation of 65 cents per square foot of the property in issue. Zinn told Vishnevsky *78 that this was to be done for "tax purposes." On August 1, 1969, Byron Speich sold his 1/2 interest in N.D.I.I. to Adolph Zinn for $34,000. On October 17, 1969, the March 21, 1969 agreement was modified to provide for the sale of four duplex units, which previously were to be transferred to Speich and petitioner, to Dr. Apell for a price of $170,000. Northeast reported the sale of four duplex units to Dr. Apell on its books and records of April 1, 1969. The sale was recorded as an installment sale for $170,000 or a per unit price of $42,500. Except for outside design, the duplex units sold to Dr. Apell were identical to the duplex units received by petitioner and Speich from Northeast. On September 22, 1969, the parcels that Northeast had transferred to the Rasmussens in accordance with the agreement of March 21, 1969, were appraised at the request of an Oshkosh bank. The properties were appraised by Thomas MacNichol, a real estate broker and appraiser in Oshkosh, Wisconsin, who had been in the real estate business since 1934 and who had made appraisals for many banks, industries and other businesses in the area. MacNichol appraised two duplex properties located at 2202-04 and *79 2228-30 Bowen Street at $38,000 each, allocating the value to land at $5,250 and to capital improvements at $32,750. MacNichol used the reproduction cost method in appraising these duplex properties. MacNichol appraised part of Outlot 4, which consisted of 340 feet fronting on Greenwood Court with a depth of 150 feet at $20,400. He appraised all of Outlot 3, which consisted of 436.5 feet along Grove Street, between Greenwood Court and Mallard Avenue, and having a depth of 135.5 feet at $19,650. He also valued a corner lot in Outlot 2, at Evans Street and Mallard Avenue, with dimensions of 96 by 135.5 feet, at $4,800. Outlot 3, which was appraised by MacNichol, is adjacent to Outlot 2, one of the properties whose value is presently in issue. Outlot 3 is located closer to Rasmussen Harbor than is Outlot 2. Outlot 4, appraised by MacNichol, is located across Greenwood Court from Outlots 2 and 3, two properties whose value is in issue. Outlot 1 is located across Evans Street from Outlot 2 and is adjacent to Outlot 21, which fronts on Bowen Street. MacNichol valued nine harbor frontage lots, located on Rasmussen Harbor, at a total value of $49,035. These lots are located across *80 Rasmussen Harbor from the harbor lots whose value is presently in issue. Furthermore, one of the harbor lots valued by MacNichol is adjacent to one of the harbor lots whose value is presently in issue. MacNichol valued the nine harbor frontage lots at values between $4,500 and $7,450. The size of the lots valued by MacNichol was generally smaller than the harbor lots presently in issue. Of the harbor lots appraised by MacNichol, five probably were buildable at the time of the appraisal whereas the others required additional fill. The higher appraised valuations assigned to certain of the lots reflected the fact that those lots were already buildable. At the time of MacNichol's appraisal, piers or pilings had not been installed on the harbor lots nor was any sod in place. The single family dwelling located at 1140 Westhaven Boulevard was sold in 1970 for $26,000. OPINION The only issue for decision is the valuation of certain real properties, both improved and unimproved, that petitioner, John Vishnevsky, received from Northeast on April 30, 1969, pursuant to a sale. Pursuant to the sale agreement Vishnevsky assumed certain mortgage obligations. The respondent has determined *81 that the fair market value of the properties received exceeded the amount of liabilities assumed and cash paid so that petitioner received dividend income in the year 1969 in the amount of $57,372.91. The alleged additional ordinary income in 1969 operates to eliminate operating loss carrybacks for the years 1966 and 1967 and a loss carryforward for 1970 that had previously been claimed by petitioner Vishnevsky. The respondent's determination also would require an increase to basis by Victor, the actual transferee of certain of the properties in issue. Determination of the fair market value of a piece of property at a given date is a question of fact. . The term "fair market value" has been defined as the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under a compulsion to buy or sell and both being reasonably informed as to all relevant facts. ; . The parties have presented various forms of evidence and testimony, including that of expert witnesses, *82 in order to substantiate the values alleged by them. Having carefully considered all of the evidence presented and having relied more extensively on certain evidence determined to be more persuasive, we have found that the fair market values of the properties in issue on April 30, 1969, were as follows: Property
Fair Market Value Lot 21
$ 7,000
Southerly 343.50 feet of Outlot 1
26,000
Northerly 340.50 feet of Outlot 2
18,000
Lake lots (Lots 5-10 and odd piece adjacent to Lot 5)
45,000
Duplex 816-18 Greenwood Court
37,000
Duplex 824-26 Greenwood Court
37,000
Single Family Dwelling 22,000
Total
$192,000
It would serve no useful purpose to recount in detail how we arrived at our valuation of each of the individual properties in issue. Our conclusions were influenced in large degree by the testimony of MacNichol regarding his appraisal of properties which were located near the properties in issue and which we determined to be comparable. In relying on the appraisals by MacNichol, we took into account differences between the properties such as requirements for fill on certain properties and the suitability of certain properties for the construction *83 of larger dwellings. We thoroughly considered the testimony of other experts and the sale prices and appraisals of other allegedly comparable properties, but we did not believe that this evidence was as valuable as the MacNichol appraisals. Our conclusions were also influenced to some extent by the respondent's argument that the sale of 1/2 of the stock in N.D.I.I. to Adolph Zinn could be relied on to determine the value of the properties held by N.D.I.I. We do not accept, however, respondent's theory that buyer and seller of this stock were negotiating only for the sale of land. The record convinces us that the parties considered other factors in arriving at a sale price for N.D.I.I. stock. Furthermore, there is some evidence in the record that improvements in existence on the date of the stock sale had not been completed on the date of the property transfer in issue. The petitioner relied extensively on assessed valuations by the City of Oshkosh in support of its alleged values. Although there is some testimony in the record that assessed valuations represented 50 percent of fair market value, we concluded that petitioner had not adequately carried his burden of proving the *84 truth of this allegation. Furthermore, the record established that assessed valuations were increasing by more than five times in the period of one year in some instances. In our opinion, the reliability of assessed valuations in determining fair market values is diminished when valuation assessments are increased so markedly in such short time periods. We have also attempted to take into account petitioner's argument that sale prices of certain of the properties in issue at later dates than the transfer in issue reflected the completion of improvements that were incomplete on April 30, 1969. Because petitioner failed to produce specific evidence regarding the times at which the improvements were made or the cost of such improvements, we were required to bear heavily against petitioner in considering the impact of this factor on fair market value. Decisions will be entered under Rule 155. Footnotes
*. Assessed as part of lot 5 ↩